UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN THOMAS BERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-08-438-B-W |
| | ) | |
| WORLDWIDE LANGUAGE | ) | |
| RESOURCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

From late November 2007 through mid-March 2008, WorldWide Language Resources, Inc. (WorldWide) employed Lt. John Berry as a subcontractor in Afghanistan to support linguists, analysts and screeners, and to serve as a liaison among these individuals, WorldWide, and the United States Government. Lt. Berry filed suit in December of 2008 alleging that by failing to honor an oral extension of his Subcontractor Agreement, WorldWide negligently or intentionally inflicted emotional distress on him, breached its employment contract/promissory estoppel, engaged in fraud, made a negligent misrepresentation, and slandered and defamed him. WorldWide moved for summary judgment on the breach of contract/promissory estoppel, fraud, negligent misrepresentation, and emotional distress claims.

The Court grants WorldWide's motion with respect to the emotional distress claims, and denies the motion with respect to the breach of contract/promissory estoppel claim and fraud and negligent misrepresentation claims. His negligent infliction of emotional distress claim fails because he has not shown that he was in a special relationship with WorldWide. His intentional infliction of emotional distress claim fails because he has not shown that WorldWide engaged in conduct so extreme and outrageous that it exceeds all bounds of decency. Lt. Berry has

demonstrated an issue of material fact as to whether WorldWide extended his contract and whether he relied on this extension to his detriment. Therefore, with the exception of Lt. Berry's emotional distress claims, the Court denies WorldWide's motion for summary judgment.

## I.     STATEMENT OF FACTS

In accordance with the "conventional summary judgment praxis," the Court recounts the facts in a light most favorable to Lt. Berry's theory of the case consistent with record support.[1] *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 17 (1st Cir. 2002).

### A.     The Parties

In the business of providing language and translation services to the United States military, WorldWide is a Massachusetts organization with its principal place of business in North Carolina. *Complaint* ¶ 2 (Docket # 1) (*Compl.*). In September 2007, John Berry, a Maine resident, met with representatives from WorldWide in North Carolina to discuss potential employment. *Def.'s Statement of Material Facts* ¶ 121 (Docket # 42) (*Def.'s SMF*); *Plaintiff's Counter-Statement of Material Facts* ¶ 121 (Docket # 45) (*Pl.'s CSMF*). Lt. Berry was an Army Reserve Second Lieutenant (2LT) who wanted to be promoted to First Lieutenant (1LT). *Def.'s SMF* ¶ 42; *Pl.'s CSMF* ¶ 42. Lt. Berry had already completed Officer Candidate School, also known as Basic Officer Lead Course I (BOLC I), and, to be promoted, Lt. Berry needed to complete Basic Officer Leader Course II (BOLC II). *Def.'s SMF* ¶¶ 40, 41; *Pl.'s CSMF* ¶¶ 40-41.

### B.     The Subcontractor Agreement

On November 22, 2007, WorldWide hired Lt. Berry to be a site manager in Afghanistan. *Def.'s SMF* ¶ 1; *Pl.'s CSMF* ¶ 1. Lt. Berry signed an employment agreement with WorldWide entitled Subcontractor Agreement. *Def.'s SMF* ¶ 2, Attach. 11; *Pl.'s CSMF* ¶ 2. Pursuant to the

---

[1] In general, the Court has relied on undisputed facts or on Lt. Berry's version when a conflict exists.

Subcontractor Agreement, Lt. Berry was to be employed for a three month term, from November 22, 2007 to February 26, 2008.[2]  *Def.'s SMF* ¶ 4, Attach. 11 at 1; *Pl.'s CSMF* ¶ 4.  The Agreement also provided that the terms to which Lt. Berry and WorldWide agreed could only be changed by a written instrument signed by both parties.  *Def.'s SMF* ¶ 5, Attach. 11 at 7; *Pl.'s CSMF* ¶ 5.

Prior to signing his Subcontractor Agreement in November 2007, Lt. Berry enrolled in BOLC II training to commence on February 6, 2008.  *Def.'s SMF* ¶ 43; *Pl.'s CSMF* ¶ 43.  WorldWide was aware of this fact and informed Lt. Berry that he could leave his WorldWide assignment early to attend the February BOLC II training.  *Def.'s SMF* ¶ 45; *Pl.'s CSMF* ¶ 45.[3]

### C.    The BOLC II Training

On November 26, 2007, after arriving in Afghanistan, Lt. Berry e-mailed his wife expressing a desire to get credit or a waiver for the BOLC II training, in which case he would not need to attend the February course.  *Def.'s SMF* ¶ 46; *Pl.'s CSMF* ¶ 46.  Specifically, Lt. Berry wrote "I talked with Maj Nalls he will help with the Credit for BOLC II.  I am going to stay for the full three months because we need the money even if it comes down to me going to BOLC later; CPT Perry in ST Louis will change it with a copy of my orders if we can not get course credit."  *Def.'s SMF* ¶ 49, Attach. 28; *Pl.'s CSMF* ¶ 49.  By December, Lt. Berry had not yet received credit for BOLC II and did not believe that he would get an extension on his contract.  *Def.'s SMF* ¶ 51; *Pl.'s CSMF* ¶ 51.  He wrote to his wife on December 16, 2007 "Abby, Can you

---

[2] The Subcontractor Agreement provides an end date of February 21, 2008.  *Def.'s SMF*, Attach. 11 at 2.  The February 26, 2008 end date is the date provided by WorldWide in its statement of material facts.  *Def.'s SMF* ¶ 4; *Pl.'s CSMF* ¶ 4.

[3] Lt. Berry qualifies this statement by stating that "Lt. Berry's decision to delay his BOLC II training was in reliance upon the promised contract extension."  *Pl.'s SMF* ¶ 45.  Lt. Berry's qualification goes to Lt. Berry's decision to delay his February BOLC II training and not to whether Worldwide told him he could leave early for this training. Lt. Berry does not dispute that officials from WorldWide gave him permission in November 2007 to leave his assignment early so that he could attend the BOLC II training, thus that portion of the Defendant's statement of material facts is deemed admitted.

find out, if I do not talk with MAJ Perry, Who down there can get by BOLC II date changes.  I am thinking SEPT because if I can extend here, I don't think they are going to let me do. . .  If the BOLC credit comes through than I am ok."  *Def.'s SMF* ¶ 50, Attach. 29; *Pl.'s CSMF* ¶ 50. Lt. Berry explains that he was willing to reschedule his BOLC II training to accommodate his WorldWide employment only on the assumption that he would receive a waiver/credit for BOLC II.  *Pl.'s CSMF* ¶ 245.  By February 2008, Lt. Berry had not yet received credit for his BOLC II course, but based on statements from WorldWide that his contract would be extended, Lt. Berry decided to delay his BOLC military training from February 2008 to September 2008, so that he could work for WorldWide the additional months.  *Def.' SMF* ¶¶ 39, 44; *Pl.'s CSMF* ¶¶ 39, 44, 244.  Lt. Berry in fact changed his BOLC II training from February 2008 to September 2008.[4] *Def.'s SMF* ¶ 44; *Pl.'s CSMF* ¶ 44.

### D.    The Promised Extension

While Lt. Berry was in Afghanistan, Tim Green served as WorldWide's regional operations manager.  *Def.'s SMF* ¶ 22; *Pl.'s CSMF* ¶ 22.  Mr. Green resigned in mid-February 2008, and was replaced by Marty Contreras.  *Id*.; *Def.'s SMF* ¶ 23; *Pl.'s CSMF* ¶ 23.  Lt. Berry trusted Mr. Green; he did not trust Mr. Contreras.  *Def.'s SMF*; *Pl.'s CSMF* ¶¶ 24, 25.  Both Mr. Green and Mr. Contreras made oral assurances to Lt. Berry such that he believed his Subcontractor Agreement would be extended beyond the February 26, 2008 term.  *Id*. ¶¶ 26, 30. In early January 2008, Mr. Green promised Lt. Berry a contract extension, informed Lt. Berry that he could stay "as long as [he] would like," that he could stay until May 1, 2008, and that "he [had] an extension until the end of April."  *Id*. ¶¶ 33, 36, 47.  Mr. Green confirmed the contract extension by at least one email.  *Pl.'s CSMF* ¶¶ 239-241.  In addition, on one occasion Lt. Berry overheard Mr. Green having a conversation with either Gene Battistini and/or Lance Manske of

---

[4] The date on which this change occurred is not included in the record.

4

WorldWide headquarters. *Pl.'s CSMF* ¶ 55. Lt. Berry overheard Mr. Green bring up his contract during this conversation, and heard Mr. Green respond "[g]ood . . . I'll expect it" or "[g]ood, I'll let him know." *Pl.'s CSMF* ¶ 55, Attach. 3, *Berry Depo*. 422:11-19. After Mr. Contreras became manager, he assured Lt. Berry that his contract would be extended, and they discussed the length of the extension and when a new written contract would be issued. *Def.'s SMF* ¶¶ 30, 31; *Pl.'s CSMF* ¶¶ 28, 30, 31.

Despite oral and written assurances that his employment contract would be extended, Lt. Berry never received a written contract extending the term beyond February 26, 2008.[5] *Def.'s SMF* ¶ 18; *Pl.'s CSMF* ¶ 18. Nevertheless, he stayed in Afghanistan after then to assist Mr. Contreras with an investigation in Herat. *Pl.'s CSMF* ¶ 246. Lt. Berry left Afghanistan in mid-March 2008, before the end of his promised extension, but after the end date in his Subcontractor Agreement. *Def.'s SMF* ¶ 118; *Pl.'s CSMF* ¶ 118.

### E.      Fraudulent and Illegal Activities

In January 2008, Lt. Berry wrote a memo to Mr. Green and Mr. Contreras outlining what he viewed as problems and potential solutions at WorldWide. *Def.'s SMF* ¶ 99, Attach. 14, *Pl.'s CSMF* ¶ 99. Lt. Berry found many of the linguists unqualified and he raised this issue with Mr. Green and Mr. Contreras. *Pl.'s CSMF* ¶¶ 95-96. Lt. Berry also raised concerns with Mr. Green and Mr. Contreras about incorrect billing of the linguists. *Def.'s SMF* ¶ 93, Attach. 2; *Berry*

---

[5] Lt. Berry denies this statement of material fact and asserts that "[a]t least one e-mail was conveyed by Tim Green, Lt. Berry's Supervisor at Worldwide, to Lt. Berry. Additionally, a confirming e-mail was conveyed by Lt. Berry inquiring when the actual written contract itself, confirming the promised and confirmed extension, would be forthcoming." *Pl.'s CSMF* ¶ 18. Defendant's statement of material fact states "Berry never obtained a written contract extension" and cites Lt. Berry's deposition during which Lt. Berry was asked "Now, you never got a written contract extension?" and to which he responded "No, never did." *Id.*, Attach. 3, *Berry Depo.*: 371:17-18. Later, Lt. Berry was asked "And I understand your testimony is you never got a new contract to sign?" Lt. Berry responded "Absolutely." Attach. 3, *Berry Depo*. 393:13-15.

Despite Lt. Berry's denial, upon analysis, the Court concludes that the parties do not really disagree. Lt. Berry admitted in his deposition that he never received a written contract that included an extension of his employment, and WorldWide's statement merely states what he acknowledged in his deposition: that he never received a written contract that extended his term of employment beyond February 26, 2008. The Court treats Defendant's statement of material fact ¶ 18 as admitted.

*Depo*. 518:14-519:19; *Pl.'s CSMF* ¶ 93.   Lt. Berry claims that "[he] was requested by [WorldWide] to commit or to not disclose a series of fraudulent and illegal acts regarding [WorldWide's] dealings and contractual relationship with the United States military and government including . . . the multiple billings of translators, the intentional mis-classification of linguists and the use of and billing for the use of incompetent translations." *Compl*. ¶ 10.  He also claims that "WorldWide knowingly misstated and misrepresented to Lt. Berry that he would obtain new contracts of employment . . . in order for him to be contractually bound to not speak with federal and military contract investigators regarding [WorldWide's] fraudulent and illegal activities."  *Compl*. ¶ 16.   When Lt. Berry refused to commit the fraudulent and illegal acts, he was "requested to leave Afghanistan."  *Compl*. ¶ 12; *Pl.'s CSMF* ¶ 116.

WorldWide denies any wrongdoing and takes the position that Lt. Berry's contract was not renewed because from the beginning it planned to employ Lt. Berry for only three months, and that it had some problems with Lt. Berry, namely that he had a physical altercation with a fellow site manager and difficulty getting along with the translators.  *Pl.'s CSMF* ¶ 117. Regardless of the reasons, Lt. Berry's employment with WorldWide ended in March 2008. *Def.'s SMF* ¶ 118; *Pl.'s CSMF* ¶ 118.

F.   **WorldWide's Conduct**

In addition to failing to honor his contract extension, Lt. Berry alleges that WorldWide engaged in threats and defamed his character.  *Compl*. ¶¶ 27, 34.  Mr. Contreras threatened Lt. Berry for the first time in February 2008, saying "[w]hat I am telling you is what should be considered law, and your career can be affected in the military if you don't do what I want . . . he even mentioned there could be a problem with physical threats, threats to my - - problems with

my family."[6]  *Pl.'s CSMF* ¶ 248, Attach. 2, *Berry Depo*. 250-51:20-22, 24-1.  Lt. Berry was only admonished or disciplined on one occasion by Lea McLemore, the Lead Program Manager, when she and Lt. Berry got into a dispute over whether he should obey Mr. Contreras's request and go to Herat to help WorldWide investigate a sexual harassment claim brought against Mr. Contreras.  *Def.'s SMF* ¶ 110; *Pl.'s CSMF* ¶¶ 110, 246.  Ms. McLemore told Lt. Berry that if he went to Herat instead of returning home, she would "take [his] ticket" and "that would be the end of [his] career."[7]  *Def.'s SMF* ¶ 66(h), Attach.1, *Berry Depo*. 277:12-24; *Pl.'s CMF* ¶ 253, Attach. 2, *Berry Depo*. 313:7-9.  Despite Ms. McLemore's warning, Lt. Berry traveled to Herat to assist Mr. Contreras.  *Pl.'s CSMF* ¶ 246.  Soon thereafter, in the middle of March 2008, Lt. Berry returned to the United States.  *Def.'s SMF* ¶ 118; *Pl.'s CSM* F ¶ 118.  While Lt. Berry was in Manas, Kyrgyzstan, en route to the United States, WorldWide withheld airfare for Lt. Berry's trip.  *Pl.'s CSMF* ¶ 253.  With the help of another WorldWide manager, Scott Lipchek, WorldWide released the funds and Lt. Berry flew out of Kyrgyzstan to Boston later that night. *Pl.'s CSMF* ¶ 253.

WorldWide stated to representatives of the United States Department of Defense that Lt. Berry had refused to accept the contract extension offered by WorldWide.  *Pl.'s CSMF* ¶ 255. Specifically, Mr. Contreras told Ron Johns, a Department of Defense employee working for Defense Contract Management Company that Lt. Berry was a good employee, but that he would not sign his new contract.  *Def.'s SMF* ¶¶ 76, 81; *Pl.'s CSMF* ¶¶ 76, 81, 255.  Mr. Contreras's statement contradicted what Lt. Berry had represented to the military commanders in Kandahar,

---

[6] It is not clear from the parties' statement of material facts when these alleged threats occurred, but based on the timing of when Mr. Contreras replaced Mr. Green, the Court assumes that these statements were made sometime in late February or early March.
[7] The date of this statement has not been identified by either party.

and to others at WorldWide, specifically that Lt. Berry had planned to stay in Afghanistan under contract.  *Def.'s SMF* ¶ 85; *Pl.'s CSMF* ¶ 85.

### G.    Lt. Berry's Injuries

As a result of WorldWide's conduct, Lt. Berry alleges that he suffered severe emotional distress, including the stress he experienced while he waited for a written contract.  *Def.'s SMF* ¶ 142; *Pl.'s CSMF* ¶ 142.   Specifically, he describes the stress as "every single day [from] December, January and March where is my contract, where is my contract, where is my contract, worrying, worrying, my wife worrying, I worrying."  *Id*. ¶ 142, Attach. 2, *Berry Depo*. 643:16-20.  He also "was stressed about providing for [his] family and making sure that [he] made the right decision to stick it out with worldwide or come back to the States and go to [his] schooling."  *Def. SMF* ¶ 141, Attach. 2, *Berry Depo*. 650:13-19.[8]  As a result of this stress, Lt. Berry broke out in what he thought were hives, but were probably shingles.  *Def.'s SMF* ¶¶ 143, 144, *Pl.'s CSMF* ¶¶ 143, 144.   When Lt. Berry returned to the United States his physical condition was also poor.  *Pl.'s CSMF* ¶ 257.

Lt. Berry experienced financial stress before and during his employment with WorldWide.  *Def.'s SMF* ¶¶ 140, 150; *Pl.'s CSMF* ¶¶ 140, 150.  While in Afghanistan, Lt. Berry was concerned that his bad credit rating might ruin his chance of obtaining a security clearance.  *Def.'s SMF* ¶ 152; *Pl.'s CSMF* ¶ 152.  These stressors took a toll on Lt. Berry's relationship with his wife and in February he sent her an email stating "[i]t's not the job Abby.  It is you that is killing me by not backing me."  *Def.'s SMF* ¶ 149; *Pl.'s CSMF* ¶ 149.  Upon his return to the United States, Lt. Berry's relationship with his wife further disintegrated and Lt. Berry and his

---

[8] Lt. Berry denies this statement of material fact, but WorldWide has merely recited a statement from Lt. Berry's deposition.  Lt. Berry should have qualified this statement and included the additional stressors to which Lt. Berry testified "including Worldwide's premature termination of his contract/denial of his promised contract extension and his subsequent stranding at Manas, Kyrgyzstan."  *Pl.'s CSMF* ¶ 141.

wife are now getting divorced.  *Def.'s SMF ¶ 153; Pl.'s CSMF ¶ 153*.  Lt. Berry's employment

with WorldWide in "profound" part caused the decline of his marriage.  *Def.'s SMF ¶ 154; Pl.'s*

*CSMF ¶¶ 154, 168, 252*.

### H.     Lt. Berry's Complaint

On  December  20,  2008,  Lt.  Berry  filed  suit  against  WorldWide  in  Waldo  County

Superior  Court.   On  December  23,  2008,  WorldWide  filed  a  notice  of  removal  on  the  basis  of

diversity of citizenship of the parties.[9]  Lt. Berry's six count complaint alleges Count I—Breach

of   Contract/Promissory   Estoppel,[10]   Count   II—Fraud,   Count   III—Negligence/Negligent

Misrepresentation; Count IV—Intentional or Negligent Infliction of Emotional Distress; Count

V—Slander, Libel and Defamation, and Count VI—Malice.[11]  *Compl.*   On January 29, 2010

WorldWide moved for summary judgment on Counts I—IV and Count VI.  *Def.'s Mot. for*

*Summ. J. and Incorporated Mem. of Law* (Docket # 40) (*Def.'s Mot.*).  Lt. Berry responded on

February 12, 2010.  *Pl's Opp'n to Def. WorldWide Language Resource's Mot. for sum. J. and*

*Incorporated Mem. of Points and Authorities* (Docket # 44) (*Pl.'s Opp'n*).  WorldWide replied

on February 26, 2010.  *WorldWide Language Resources, Inc. Reply to Pl.'s Opp'n to the Mot.*

*for Summ. J.*  (Docket # 48) (*Def.'s Reply*).

---

[9] Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction if there is diversity of citizenship and the amount in controversy exceeds $75,000.    Lt. Berry's complaint does not allege that the amount in controversy exceeds $75,000.  In fact, his complaint contains no reference to § 1332.  WorldWide, however, in its request for removal asserts that "the amount in dispute is, on information and belief, believed to exceed $75,000.00."  *Notice of Removal* ¶ 13 (Docket # 4).

[10] Lt. Berry's first count also alleges that he "was requested by Defendant to commit or to not disclose a series of fraudulent and illegal acts regarding Defendant's dealings and contractual relationship with the United States military and government", that he "refused to commit those fraudulent and illegal acts", and that "due to [his] foregoing refusal to commit fraudulent and illegal acts, [his] contracts were not honored by Defendant and [he] was requested to leave Afghanistan."  *Compl.* ¶¶ 10-12.  Given that Lt. Berry has failed to satisfy the statutory prerequisites of an unlawful retaliation claim by first filing a complaint with the Maine Human Rights Commission, 26-M.R.S.A.§ 834-A, and the Equal Employment Opportunity Commission, the Court treats Count I as labeled, a breach of contract and promissory estoppel claim.

[11]   For purposes of this motion, Lt. Berry asserts that malice is not a separate substantive cause of action under Maine law, but is, "rather, a prayer of punitive damages when malicious conduct is proven to the standard of clear and  convincing  evidence."   *Pl.'s  Opp'n  to  Def.  Worldwide  Language  Resource's  Mot.  for  Summ.  J.  and Incorporated Mem. of Points and Authorities* at 2 n.1 (Docket # 44) (*Pl.'s Opp'n*).

## II.    DISCUSSION

### A.    Legal Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2). For summary judgment purposes, "'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218-19 (1st Cir. 2004)) (internal quotation marks omitted). "Neither conclusory allegations [nor] improbable inferences are sufficient to defeat summary judgment."  *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2009) (citation and internal quotation marks omitted).

### B.    Count I—Breach of Contract/Promissory Estoppel

#### 1.    The Parties' Positions

WorldWide argues that summary judgment on Count I of Lt. Berry's complaint is appropriate because the terms of the Subcontractor Agreement "required [the parties] to make any amendment in writing," and "there exists no writing amending the written contract to extend its duration."  *Def.'s Mot.* at 4.  Therefore, "no reasonable jury could find that WorldWide breached the written contract when it refused to extend Berry's employment in March, 2008." *Id.*  Additionally, WorldWide contends that summary judgment is proper on Lt. Berry's breach of contract and promissory estoppel claims because "the alleged promise to extend was not supported by any consideration or detrimental reliance." *Id.* "In the absence of valid

consideration, there exists no enforceable oral contract to extend the written agreement, and Berry's breach of contract claim must fail as a matter of law." *Id.* at 6.

Lt. Berry responds that he was "offered an extension of his employment contract by his superiors at Worldwide [and] that offer was confirmed in writing," creating "a valid and enforceable contract extension, even absent any reliance. The contract extension was confirmed by Tim Green both to Lt. Berry and to Worldwide headquarters. Apparently, nothing was done in North Carolina to deny the extension offered by Tim Green." *Pl.'s Opp'n* at 4, 6. Alternatively, Lt. Berry contends that "he relied detrimentally upon that extension in two regards: (A) by rescheduling a military program necessary for his promotion and (B) by staying in Afghanistan beyond the original date of his contract termination to assist his supervisor in dealing with a sexual harassment case at the request of his supervisor." *Pl.'s Opp'n.* at 4.

## 2.   Discussion

### a.   Contract Modification

Lt. Berry admits that his initial Subcontractor Agreement was for three months: November 22, 2007 to February 26, 2008. *Def.'s SMF* ¶ 4; *Pl.'s CSMF* ¶ 4. He admits that this agreement could "be changed only by a written instrument signed by both of the parties." *Def.'s SMF* ¶¶ 5-7; *Pl.'s CSMF* ¶¶ 5-7. He admits that he never signed any other documents other than the Subcontractor Agreement, and that he never received a new written contract with the extensions. *Def.'s SMF* ¶¶ 8, 18; *Pl.'s CSMF* ¶ 8. Lt. Berry does not dispute that the emails he has produced do not constitute an agreement to extend his employment term at WorldWide. *Def.'s SMF* ¶ 20. Further, Lt. Berry admits that to the extent his relationship with WorldWide changed, it was only by alleged oral promises extending the term of the agreement. *Def.'s SMF* ¶ 120; *Pl.'s CSMF* ¶ 120. The Court has no written contract before it to evaluate and the

11

statement of material facts do not support the existence of a new written contract.  Any extension of Lt. Berry's contract was made through the oral representations of WorldWide employees.

Although WorldWide disputes that it made any oral promises to extend Lt. Berry's contract, the Court must view the record in the light most favorable to Lt. Berry and therefore assumes for summary judgment purposes that WorldWide through Mr. Green promised Lt. Berry that his employment would be extended until May 1, 2008, that Mr. Green discussed this extension with Mr. Battistini and/or Mr. Manske (employees at WorldWide headquarters), and that Mr. Contreras discussed the extension with Lt. Berry.[12]   The question is whether in the course of these discussions, Mr. Green's promise became an effective modification of Lt. Berry's original Subcontractor Agreement.

WorldWide highlights a clause in the Subcontractor Agreement which provides that "[the] Agreement may be changed only by written instrument signed by both of the parties." *Def.'s SMF*, Attach. 11 at 8.  Based on a choice of law provision in the employment contract, the parties agree that Lt. Berry's contractual claims are governed by the substantive law of North Carolina.[13]  *Def.'s Mot.* at 3 n.3; *Pl.'s Reply* at 7 n.3.  It is well established in North Carolina that "[t]he provisions of a written contract may be modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract have been modified or waived, *even though the instrument involved*

---

[12]  The parties do not dispute for purposes of this motion that Mr. Green promised to extend Lt. Berry's contract. *Def.'s Resp. to Pl.'s CSMF* ¶ 242.  Mr. Contreras does not appear to have made a similar promise.  Lt. Berry has admitted WorldWide's statement that "Although Contreras made assurances, according to Berry, after Green resigned, Berry did not trust Contreras nor believe the assurances."  *Def.'s SMF* ¶ 30.  WorldWide has not specified what "assurances" were made.  Lt. Berry's testified in his deposition that he and Mr. Contreras did not discuss whether his contract would be extended, but rather discussed the length of the extension and memorializing the extension in a document.  *Pl.'s CSMF* ¶¶ 28, 29; Attach. 3, *Berry Depo*. 404:23-505:6.  The fact that Mr. Contreras discussed an extension with Lt. Berry, indicates that although Mr. Contreras may not have made an oral promise of an employment extension, he acted as though an extension was possible.

[13] The Subcontractor Agreement contains a choice of law provision which provides that North Carolina state law applies.  As there is no disagreement, there is no need for the Court to make a choice of law determination.  *See Kelly Servs. v. Green*, 535 F. Supp. 2d 180, 184 n.5 (D. Me. 2008).

*provides that only written modifications shall be binding*." *Son-Shine Grading, Inc. v. ADC Constr. Co.*, 68 N.C. App. 417, 422, 315 S.E.2d 346, 349 (1984) (emphasis supplied); *see Graham and Son, Inc. v. Board of Education*, 25 N.C. App. 163, 167, 212 S.E.2d 542, 544-45(1975) (A provision of a written contract may be modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived.  This principle has been sustained even where the instrument provides for any modification of the contract to be in writing); *W.E. Garrison Grading Co. v. Piracci Construction Co., Inc.*, 27 N.C. App. 725, 221 S.E. 2d 512 (1975) (same).  WorldWide's reliance on the contractual provision that restricts modifications to written agreements is unavailing under North Carolina law.

Applying North Carolina law, the question becomes whether WorldWide "modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract have been modified or waived." *Son-Shine Grading*, 68 N.C. App. at 422, 315 S.E.2d at 349.  More precisely, in the context of the motion for summary judgment, the question becomes whether there is a genuine issue of material fact as to whether WorldWide did so.  Reviewing the record, the Court readily concludes that Lt. Berry has produced sufficient evidence to generate a factual question on these issues.  First, Lt. Berry asserts that Mr. Green made express promises and Mr. Contreras made express assurances to Lt. Berry that his contract would be extended.  Although WorldWide argues that neither Mr. Green nor Mr. Contreras had authority to do so, *Def.'s Resp. to Pl.'s CSMF* ¶ 243, Lt. Berry has proffered sufficient evidence to suggest that Mr. Green discussed Lt. Berry's contract extension with WorldWide management (Mr. Battistini and/or Mr. Manske) and that WorldWide approved the contract extension that Mr. Green had discussed with Lt. Berry.   Mr. Green and Mr.

13

Contreras supervised Lt. Berry, and there is no evidence to suggest that Lt. Berry was not justified in believing them when they told him that his Subcontractor Agreement would be extended.

In addition to the oral representations of WorldWide employees, WorldWide acted inconsistently with the February 26, 2008 termination date in the Subcontractor Agreement. Rather than ordering Lt. Berry back to the United States on February 26, 2008, WorldWide allowed Lt. Berry to stay several days beyond his original end date and, although there is some dispute about whether Lt. Berry was authorized to travel to Herat in the middle of March to help WorldWide investigate the sexual assault claim, WorldWide does not dispute that he in fact did so. *Pl.'s CSMF* ¶ 246. Lt. Berry's continued presence in Afghanistan after February 26, 2008, and his continued work for WorldWide raises an inference that WorldWide authorized a contract extension regardless of the terms of the Subcontractor Agreement. Given Mr. Green's promise, Mr. Contreras's assurances, WorldWide's apparent knowledge of and approval of any promise, Lt. Berry's remaining beyond his February 26, 2008 end-date into the middle of March on a WorldWide project, a reasonable jury could conclude that Lt. Berry "naturally and justly" believed that the end date of his Subcontractor Agreement had been modified under North Carolina law, despite the fact there was nothing in writing. *Son-Shine Grading*, 68 N.C. App. at 422, 315 S.E.2d at 349.

### b.    Detrimental Reliance

For parol modification of a written contract to be effective, all the requisites of a contract must be met, including "mutual assent to the modification, and consideration or a substitute supporting it." *Altman v. Munns,* 82 N.C. App. 102, 105, 345 S.E.2d 419, 422 (1986). WorldWide contends that "[b]ecause there exists no consideration for the alleged promise to

extend the contract, Plaintiff's breach of contract claim must fail." *Def.'s Mot.* at 5 n.2. WorldWide is correct; "an enforceable contract is one supported by consideration." *Lee v. Paragon Group Contractors*, 78 N.C. App. 334, 337, 337 S.E.2d 132, 134 (1985). "[A] mere promise, without more, is unenforceable." *Id.* at 338, 337 S.E.2d at 134. Consideration, however, takes many forms and consists of "any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee[.]" *Island Construction Co. v. Cameron Park II, Ltd.*, 181 N.C. App. 573, 577-78 (2007); *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 215, 274 S.E.2d 206, 212 (1981) (same). Thus, an agreement to modify the terms of a contract can be based "on evidence that one party intentionally induced the other party's detrimental reliance . . . ." *Clifford v. River Bend Plantation, Inc.,* 312 N.C. 460, 466, 323 S.E.2d 23, 27 (1984) (internal quotation marks omitted); *see also Wheeler v. Wheeler*, 299 N.C. 633, 636, 263 S.E. 2d 763, 765 (1980) (An agreement to modify the terms of a contract must be based on new consideration or on "evidence that one party intentionally induced the other party's detrimental reliance.").

For purposes of this motion only, WorldWide concedes that "the issue of whether Tim Green actually made a promise to extend Berry's contract does indeed constitute an issue of fact," but it contends "that the issue is not material to this motion because the undisputed facts show that Berry could not have and did not actually rely on any such promise." *Def.'s Resp. to Pl.'s CSMF* ¶ 242. Lt. Berry argues that he has shown detrimental reliance in two ways: first, by rescheduling a military program necessary for his promotion and second, by staying in Afghanistan beyond the original end date of his contract to assist with a sexual harassment case at the request of his supervisor. *Pl.'s Opp'n* at 4.

Lt. Berry's second reason explains what he did for WorldWide after his scheduled end date and does not demonstrate detrimental reliance.  As for Lt. Berry's first reason, WorldWide contends that "[b]ecause Berry decided to reschedule his BOLC II training before WorldWide's alleged promise to extend his contract and at a time when he did not believe he would ever receive such a promise, Berry could not have relied upon any such promise in rescheduling such training."  *Def.'s Mot.* at 8.  WorldWide finds traction for its argument in the emails Lt. Berry sent to his wife discussing his BOLC II training.  As early as November 2007, Lt. Berry emailed his wife about changing his BOLC II course.  On November 26, 2007, he wrote "I am going to stay the full three months because we need the money even if it comes down to me going to BOLC II later.  CPT Perry in ST Louis will change it with a copy of my orders if we can not get course credit."  *Def.'s SMF* ¶ 49; *Pl.'s CSMF* ¶ 49.  On December 16, 2007, Lt. Berry again wrote "Abby, Can you find out, if I do not talk with MAJ Perry, Who down there can get my BOLC II date change.  I am thinking SEPT because if I can extend here, which I don't think they are going to let me do."  *Def.'s SMF* ¶ 50; *Pl.'s CSMF* ¶ 50.  WorldWide argues that these emails demonstrate Lt. Berry's desire to change his BOLC II course before any promises by Mr. Green and therefore, Lt. Berry could not have relied on Mr. Green's promise to extend his contract when he changed his BOLC II training.  *Def.'s Mot.* at 7-8.

Lt. Berry responds that WorldWide mischaracterized his testimony on the rescheduling of the BOLC II course.  Specifically, Lt. Berry states that "he was willing to reschedule his BOLC II training (and subsequent BOLC III training) to accommodate his WorldWide employment only upon the assumption that he would receive a waiver/credit for BOLC II.  His communications with his wife cited above were for the purpose of pursuing the waiver/credit.  In fact, ultimately, he detrimentally delayed BOLC II in reliance upon and to accommodate his

16

promised contract extension with WorldWide." *Pl.'s CSMF* ¶ 48. Lt. Berry's explanation is cryptic, but the Court concludes that, when viewed in the light most favorable to Lt. Berry, it raises a triable issue.

As for whether this reliance was detrimental, Lt. Berry alleges that his reliance on Mr. Green's promise delayed his promotion. Lt. Berry has not expounded on this contention beyond stating that he had to "reschedule a military program necessary for his promotion." *Pl.'s Opp'n* at 4. Lt. Berry's argument appears to be that had he attended his BOLC II training in February 2008, Lt. Berry would have been eligible for all the benefits that flow from a higher rank, including a salary increase, sooner. Again viewing the evidence in the light most favorable to Lt. Berry, the Court concludes that a reasonable jury could find that the rescheduling of his BOLC II training was to Lt. Berry's detriment.

Having established the existence of a valid contract, the question becomes whether WorldWide breached this contract. *See Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (stating ("[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract"). Lt. Berry claims he was terminated for retaliatory purposes, while WorldWide claims that Lt. Berry's employment ended because of a physical altercation with another site manager and his inability to get along with translators. Given these different explanations, WorldWide may or may not have breached its contract with Lt. Berry. Even if WorldWide has not breached its contract, Lt. Berry has sufficiently made a claim for promissory estoppel because he detrimentally relied on the promise of an extension. The Court denies summary judgment on Count I.[14]

---

[14] WorldWide also argues that "[i]n light of Berry's knowledge that any alleged promise to extend his contract had to be in writing and in light of the culture and [military] circumstances in which he admittedly operated, Berry cannot genuinely establish that he reasonably relied on WorldWide's alleged oral promise to extend the Subcontractor Agreement." *Id*. at 9. Whether Lt. Berry's reliance on WorldWide's promises was reasonable is a

### C.      Counts II & III—Fraudulent and Negligent Misrepresentation

#### 1.      The Parties' Positions

Lt. Berry's misrepresentation claims are premised on statements made by Mr. Green and Mr. Contreras and confirmed by WorldWide officials, Gene Battistini and/or Lance Manske. WorldWide focuses on the statements of Mr. Green and Mr. Contreras.  It argues that there is no evidence that Mr. Green's statements were false; Mr. Green is an honorable and trustworthy person and any promise he made to extend was therefore truthful.  *Def.'s Mot.* at 10.  As for Mr. Contreras, WorldWide cites Lt. Berry's own testimony that he did not trust Mr. Contreras and it "would have been stupid" to believe any representations he made about a contract extension. *Def.'s Mot.* at 10.  Lt. Berry argues that his claims of fraudulent and negligent misrepresentation are arguments in the alternative to his breach of contract claim, and should be allowed to proceed "since Worldwide now maintains that his supervisors were not authorized to make such an extension." *Pl.'s Opp'n* at 8.  He simply maintains that there are genuine issues of material fact regarding "(a) whether false representations of a contract extension were made, and (b) whether Lt. Berry detrimentally relied on those representations." *Id.*

#### a.      The Legal Standard

To prevail on a claim for intentional fraud, the plaintiff must prove by clear and convincing evidence: (1) that the defendant made a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true or false, (4) for the purpose of inducing the plaintiff to act in reliance upon it, and, (5) the plaintiff justifiably relied

---

question of fact for the jury.  Finally, WorldWide argues that Lt. Berry's promissory estoppel claim fails because "North Carolina expressly rejects the theory of detrimental reliance to enforce the terms of an agreement that otherwise lacks the necessary elements of a valid enforceable contract." *Id.* at 9.  The Court has found that a valid enforceable contract extension was created through WorldWide and Lt. Berry's actions.  Thus, Lt. Berry's promissory estoppel claim survives.

upon the representation as true and acted upon it to the plaintiff's damage.[15]  *Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 9, 832 A.2d 771, 773 (Me. 2003).   A claim for negligent misrepresentation arises when:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.*, ¶ 13, 832 A.2d at 774 (citing Restatement (Second) Torts § 552(a)(1) (1977)); *see also Perry v. H.O. Perry & Son Co.*, 1998 ME 131, P 5, 711 A.2d 1303, 1305 (reaffirming the Maine Supreme Judicial Court's previous adoption of section 552(a)(1)).

Claims for fraudulent and negligent misrepresentation, although distinct, both require that the defendant make a false representation of present fact and that the plaintiff justifiably rely on the representation as true.  *Kearney v. J.P. King Auction Co.*, 265 F.3d 27, 34 n.8 (1st Cir. 2001). "Traditionally, an action for deceit could be brought under Maine law only if the challenged misrepresentation was of past or existing fact, not just of opinion or of promises for future performance."  *Id.*, 265 F.3d at 34 (citation and internal quotation marks omitted).   "Even a preconceived intention not to perform was said to be incapable of turning a breach of a promise . . . to do something in the future into an action for deceit."  *Id.* (citation and internal quotation marks omitted).  However, as Maine law has evolved, "in appropriate circumstances, promises concerning future performance may be sufficiently akin to averments of fact as to be actionable under Maine misrepresentation law."  *Id.* at 35 (citation and internal quotation marks omitted). Specifically, "the relationship of the parties or the opportunity afforded for investigation and the

---

[15] The parties agree that unlike the contract claim Maine law controls Lt. Berry's tort claims.  Again, as there is no disagreement, there is no need for the Court to make a choice of law determination.  *See Kelly Servs. v. Green*, 535 F. Supp. 2d at 184 n.5.

reliance, which one is thereby justified in placing on the statement of the other, may transform into an averment of fact that which under ordinary circumstances would be merely an expression of opinion." *Wildes v. Pens Unlimited Co.*, 389 A.2d 837, 840 (Me. 1978) (citation, internal quotation marks and emphasis omitted).  The First Circuit has observed such a transformation when,"the plaintiff is at the mercy of the defendant, such as in employment situations where an employer, with full knowledge of imminent corporate downsizing, nevertheless promises a position to a new salesperson." *Kearney*, 265 F.3d at 35 (citation and internal quotation marks omitted).  Thus, WorldWide's statements promising future employment are actionable if they were false and if Lt. Berry justifiably relied on them to his detriment.

### b.    False Statements of Material Fact

WorldWide focuses on the statements by Mr. Green and Mr. Contreras.  As regards Mr. Green, WorldWide argues that Lt. Berry cannot prove that Mr. Green made a false statement— that is, Mr. Green truthfully offered an employment extension to Lt. Berry.  *Def.'s SMF* ¶¶ 58, 59; *Pl.'s CSMF* ¶¶ 58, 59.  As regards Mr. Contreras, WorldWide does not argue that Mr. Contreras statements were false, but instead states that Lt. Berry would not have believed any promise by Mr. Contreras, because he did not trust Mr. Contreras.  It also argues that any statements made by Mr. Green or Mr. Contreras were false because they were unauthorized. *Def.'s Resp. to Pl.'s CSMF* ¶ 243.

WorldWide's contentions are, in the Court's view, flawed.  WorldWide's position is laden with inadmissible character evidence, Fed. R. Evid. 608(a), and it seeks to have it both ways.[16]  WorldWide would have it that because Mr. Green is a truthful person, he must have been telling the truth when he told Lt. Berry that he would get a contract extension.  Conversely,

---

[16] Federal Rule of Evidence 608(a)(2) provides that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."

because Mr. Contreras is an untruthful person, Lt. Berry had no right to believe him when he said that he would get a contract extension.  In short, if the supervisor is honest, WorldWide wins, and if he is dishonest, WorldWide still wins.  WorldWide's position, however, ignores human reality that Rule 608(a) captures: people are not either liars or truth-tellers, they tend to fall somewhere in between.   It is the jury's job at trial to resolve credibility issues, not the judge's job at summary judgment to do so.  *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 49 (1st Cir. 1999); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726, at 446 (3d ed. 1998) ("Clearly, if the <u>credibility</u> of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial") (footnote omitted).

The Court starts with the premise that what both Mr. Green and Mr. Contreras said to Lt. Berry about the extension of the contract turned out to be false – contrary to their representations, he was not accorded a contract extension.  As regards their representations, there are three possibilities: 1) when they made the statements, they were telling the truth, but the statements later proved to be false; 2) when they made the statements, they knew them to be false or acted in reckless disregard as to whether they were false; or 3) when they made the statements, they failed to use reasonable care to ascertain that they were true.  Which category the Green and Contreras statements fit within is a question of fact to be resolved by a jury, but viewing the evidence in the light most favorable to Lt. Berry, there is sufficient evidence to generate a triable issue for any of the possibilities, precluding summary judgment.

WorldWide's contention that because Lt. Berry did not trust Mr. Contreras, the Lieutenant cannot claim that he justifiably relied on his representations attempts to make a virtue

out of dishonesty. It remains a question of fact whether Lt. Berry's skepticism of Mr. Contreras's truthfulness extended so far that he could not justifiably believe anything Mr. Contreras said about his employment. Again, looking at the record in the light most favorable to Lt. Berry, there is sufficient evidence in the record to allow a factual finding that Lt. Berry was justified in believing that Mr. Contreras was accurately relating WorldWide's position regarding his contract extension. This is particularly true since Mr. Contreras's representations echoed Mr. Green's prior promises.

Finally, the reiterated representations of Mr. Green and Mr. Contreras were confirmed by the snippets of conversion that Lt. Berry overheard between Mr. Green and either Mr. Battistini and/or Mr. Manske. To the extent WorldWide argues that neither Mr. Green nor Mr. Contreras had authority to promise Lt. Berry a contract extension, the overheard conversation with personnel at WorldWide headquarters could have reasonably led Lt. Berry to conclude that they were acting with management approval.

The Court denies the motion for summary judgment on Counts II and III, the fraudulent and negligent misrepresentation claims.

### D.    Count IV—Emotional Distress Claims

#### 1.    The Parties' Positions

Lt. Berry alleges emotional distress as a result of WorldWide's intentional or negligent actions. *Compl*. at 4. WorldWide argues that Lt. Berry's claim for intentional emotional distress does not survive summary judgment because WorldWide's conduct including discharging Lt. Berry from employment, refusing to pay for his flight home, making threatening and defamatory statements, and denying him of a firearm do not constitute "extreme and outrageous" conduct. *Def.'s Mot*. at 12-14. WorldWide also argues that the negligent and intentional emotional

distress claims fail because Lt. Berry has not suffered severe emotional distress; he never saw a psychologist, or took antidepressant or anti-anxiety medication; he did not complain about his employment; and the financial stress he experienced existed prior to his leaving for Afghanistan. *Def.'s Mot*. at 14-16. WorldWide asserts that "the duty necessary for [a] negligent infliction of emotional distress claim does not exist in the context of the employment relationship" and therefore WorldWide did not have a "duty to act reasonably to avoid emotional harm." *Def.'s Mot*. at 17. WorldWide asserts that the negligent infliction of intentional distress claim also fails because Lt. Berry has not demonstrated "that his alleged injuries were foreseeable." *Def.'s Mot*. at 17-18.

### 2.    Negligent Infliction of Emotional Distress

In a negligent infliction of emotional distress (NIED) claim, a plaintiff must set forth facts from which it could be concluded that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was harmed; and (4) the breach caused the plaintiff's harm. *Devine v. Roche Biomed. Labs., Inc.*, 637 A.2d 441, 447 (Me. 1994). To recover on a claim of negligent infliction of emotional distress, a plaintiff must demonstrate that the alleged harm reasonably could have been expected to befall the ordinarily sensitive person. *Theriault v. Swan*, 558 A.2d 369, 372 (Me. 1989) (citing *Gammon v. Osteopathic Hospital of Maine, Inc.*, 534 A.2d 1282, 1285 (Me. 1987)). When the harm reasonably could affect only the hurt feelings of the supersensitive plaintiff -- the eggshell psyche -- there is no entitlement to recovery. *Theriault*, 558 A.2d at 372. If, however, the harm reasonably could have been expected to befall the ordinarily sensitive person, the tortfeasor must take his victim as he finds her, extraordinarily sensitive or not. *Id*. (citing Restatement (Second) of Torts § 461 (1975)).

23

Plaintiffs claiming NIED face a significant hurdle in establishing the requisite duty, in great part because the determination of duty in these circumstances is not generated by traditional concepts of foreseeability. *Cameron v. Pepin*, 610 A.2d 279, 284 (Me. 1992). Thus, the duty to act reasonably to avoid emotional harm to others is recognized in very limited circumstances: first, in claims commonly referred to as bystander liability actions; and second, in circumstances in which a special relationship exists between the actor and the person emotionally harmed. *Cutis v. Porter*, 2001 ME 158, ¶ 19, 784 A.2d 18, 25.

Lt. Berry's claim is based on the existence of a special relationship, not bystander liability. WorldWide asserts that "[c]ourts have refused to recognize the existence of a special, unique relationship between an employer and employee so as to give rise to a duty to avoid emotional distress which would create liability for negligent infliction of emotional distress." *Def. Mot.* at 17. In support of this broad proposition, WorldWide cites *Jamison v. OHI*, No. CV-03-569, 2005 Me. Super. LEXIS 161, at *12 (Me. Super. Ct., Nov. 28, 2005) and references *Solomon v. Duke University*, 850 F. Supp. 372, 373 (M.D.N.C. 1993). However, the *Jamison* Court did not address a current employer-employee relationship, but a former one. *Jamison*, at *4 (stating that "[t]he relationship of a former employer to its former employee has not been recognized as giving rise to a duty to avoid emotional distress"). *Solomon* is equally unpersuasive. In *Solomon*, the Court dismissed plaintiff's negligent infliction of emotional distress claims, because the plaintiff had agreed to have her dispute resolved by arbitration, and the arbitrator's decision prevented any further claims surrounding plaintiff's termination. 850 F. Supp. at 373.

There is more persuasive authority. In *Devine*, the Maine Supreme Judicial Court cautioned that a "plaintiff who fails to prove that the defendant violated a duty of care owed to

24

the plaintiff cannot recover, whether the damage is emotional, physical, or economic." *Devine*, 637 A.2d 447.  Specifically with claims of the negligent infliction of emotional distress, the Law Court has required "a particular duty based upon the unique relationship of the parties . . . for harming the emotional well-being of another." *Bryan R. v. Watchtower Bible & Tract Soc'y Inc.*, 1999 ME 144, ¶ 31, 738 A.2d at 848.  It has found such a special relationship in narrow circumstances.  *Bolton v. Caine*, 584 A.2d 615, 618 (Me. 1990) (holding that a physician-patient relationship gives rise to a duty to avoid emotional harm from failure to provide critical information to patient); *Gammon v. Osteopathic Hosp. of Me.*, 534 A.2d 1282, 1285 (Me. 1987) (holding a hospital's and funeral home's relationship to the family of a decedent gives rise to a duty to avoid emotional harm from handling remains); *Rowe v. Bennett*, 514 A.2d 802, 806-07 (Me. 1986) (holding that the unique nature of the psychotherapist-patient relationship gives rise to a duty of care to the patient); *see Angelica v. Drummond, Woodsum & MacMahon, P.A.*, Civil Action No. CV-02-15, 2003 Me. Super. LEXIS 197, at *28 (Me. Super. Ct., Sep. 9, 2003) (holding that an attorney-client relationship was a special relationship for a NIED claim); *Leroy v. Maine Children's Home*, Docket No. CV-02-125, 2002 Me. Super. LEXIS 182, at *6-7 (Me. Super. Ct., Sep. 19, 2002) (finding "special relationship" under a NIED claim between adoptive parents and an adoption agency).

But it has rejected attempts to extend the special relationship beyond narrow constraints. *Curtis v. Porter*, 2001 ME 158, 784 A.2d 18 (no special relationship between a pizza delivery person and a customer in a NIED claim); *Bryan R.*, 1999 ME 144, ¶¶ 31-32, 738 A.2d at 848-49 (rejecting a claim that the relationship between a church and its members was of the type that would give rise to a duty to avoid psychic injury to the members); *Estate of Cilley v. Lane*, 2009 ME 133, 985 A.2d 481 (rejecting a claim that a former girlfriend owed a duty to her former

boyfriend, who was trespassing on her property, to rescue him after he had shot himself); *Richards v. Town of Eliot*, 2001 ME 132, ¶ 34, 780 A.2d 281, 293 (finding no "special relationship" between a police officer and an arrestee for purposes of a NIED claim).

In *Veilleux v. National Broadcasting Co.*, the First Circuit refused to extend a special relationship under Maine law to a claim by a potential subject against a journalist. 206 F.3d 92, 130-31 (1st Cir. 2000). The appellate court noted that the Maine Law Court "has proceeded cautiously in determining the scope of a defendant's duty to avoid inflicting emotional distress" and it declined to "expand this relatively undeveloped doctrine beyond the narrow categories addressed thus far." *Id.* at 131. *See Eichelberger v. Northern Outdoors, Inc.*, Docket No. 07-82-P-S, 2007 U.S. Dist. LEXIS 74542, at *7-10 (D. Me. Oct. 4, 2007) (concluding that there was no "special relationship" between a rafting company and a minor child for purposes of a NIED claim); *Montgomery v. Am. Auto. Ins. Co.*, No. 06-cv-116-GZS, 2006 U.S. Dist. LEXIS 67620, at *5-6 (D. Me. Sep. 20, 2006) (concluding that there was no "special relationship" between an insurer and an insured for purposes of a NIED claim); *Cheung v. Wambolt*, Civil No. 04-127-B-W, 2005 U.S. Dist. LEXIS 10808, at *32-33 (D. Me. Jun. 2, 2005) (finding no "special relationship" between a landlord and tenant for purposes of a NIED claim), *Jamshab v. Nationwide Ins. Co.*, No. 05-50-P-C, 2004 U.S. Dist. LEXIS 26097, at *28 (D. Me. Dec. 29, 2004) (concluding that there is no "special relationship" between a insurer and insured for a NIED claim from issuing an insurance policy); *Santoni v. Potter*, 222 F. Supp. 2d 14, 28-29 (D. Me. 2002) (finding no "special relationship" between a postal inspector performing a criminal investigation and a former postmaster for purposes of a NIED claim).

In 2005, a magistrate judge in the District of Maine addressed precisely the question now before the Court: whether the special relationship Maine law requires for a NIED claim extends

to employer-employee relationships.   Ironically, the case involved WorldWide Language Resources.  *Gavrilovic v. WorldWide Languages Resource, Inc.*, Civil No., 05-38-P-H, 2005 U.S. Dist. LEXIS 32134, at *85 (D. Me. Dec. 8, 2005).  The *Gavrilovic* Court found nothing "special" or "unique" about the plaintiff's working relationship with WorldWide, and found the relationship nothing more than "an ordinary business relationship."  2005 U.S. Dist. LEXIS 32134, at * 91.   Based on *Veilleux*, the Magistrate Judge was reluctant to recommend expansion of "this relatively undeveloped doctrine beyond the narrow categories addressed thus far."  *Id.* (quoting *Veilleux*, 206 F.2d at 131).

The Maine Supreme Judicial Court has found a special relationship in situations where the plaintiff is "extremely vulnerable to mental harm," such as a psychotherapist-client relationship.  *Rowe*, 514 A.2d at 806-07.  To extrapolate the Law Court's concern for vulnerable victims to general employer-employee relationships would impermissibly expand the circumscribed scope of the tort.  Guided by the First Circuit, by the Maine Supreme Judicial Court, and by District precedent, the Court declines to categorize an employer-employee relationship as a "special relationship" under Maine law for purposes of a NIED claim.  The Court concludes that WorldWide is entitled to summary judgment on Lt. Berry's NIED claim.[17]

### 3.    Intentional Infliction of Emotional Distress

To withstand WorldWide's motion for summary judgment on a claim of intentional infliction of emotional distress (IIED), Lt. Berry must present facts in support of each of the following four elements:

---

[17] Even if Lt. Berry were able to surmount the special relationship requirement, the record fails to support the severe emotional distress the Law Court requires for a NIED claim.  *Holland v. Sebunya*, 2000 ME 160, ¶ 18, 759 A.2d 205, 212 (stating that the torts of intentional and negligent infliction of emotional distress "require proof of severe emotional distress"); *Fuller v. Central Me. Power Co.*, 598 A.2d 457, 459 (Me. 1991) (stating that "[w]e have never held that liability can be imposed upon a defendant for the negligent infliction of severe emotional distress of some degree less than severe").

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable [person] could be expected to endure it.

*Curtis*, 2001 ME 158, ¶ 10, 784 A.2d at 22-23 (quoting *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 15, 711 A.2d 842, 847).  In the context of an IIED claim, "it is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery, or whether it is necessarily so." *Colford v. Chubb Life Ins. Co. of Am.*, 687 A.2d 609, 616 (Me. 1996) (quoting *Rubin v. Matthews Int'l Corp.*, 503 A.2d 694, 699 (Me. 1986)).  Thus, while the jury must determine whether the elements of the tort were in fact satisfied, the Court must first determine whether, as a matter of law, the alleged facts are sufficient to satisfy the elements.

Lt. Berry identifies five categories of incidents as having resulted in severe emotional distress: (1) Lt. Berry's discharge; (2) WorldWide's failure to pay for his flight home; (3) WorldWide's threats to Lt. Berry; (4) WorldWide's defamatory statements about Lt. Berry; and, (5) WorldWide's refusal to allow Lt. Berry to possess a firearm.  *Def.'s Mot*. at 12-14.

### a.    WorldWide's Conduct

#### i.    Job Termination

Although the parties dispute the reasons for Lt. Berry's termination, the Court can easily dispose of Lt. Berry's claim that WorldWide's conduct in terminating his employment is conduct that supports a claim for IIED.  The law is clear; termination from employment is an insufficient predicate for an IIED claim against an employer.  *Gavrilovic*, 2005 U.S. Dist. LEXIS 32134, at *105-06 (stating that "employment terminations -- even baseless, discriminatory and/or

humiliating ones -- have been held as a matter of law to constitute an insufficient predicate for a claim against an employer of IIED"); *Staples v. Bangor Hydro-Electric Co.*, 561 A.2d 499, 501 (Me. 1989) (upholding summary judgment on IIED claim where plaintiff had claimed that supervisor humiliated him at staff meetings and demoted him without just cause; observing that "such evidence falls far short of the [*Vicnire v. Ford Motor Credit Company*, 401 A.2d 148, 154 (Me. 1979)] standard and would not warrant submitting the case to the jury"); *Walton v. Nalco Chemical Co.*, 272 F.3d 13, 18 (1st Cir. 2001). Nor does WorldWide's termination of Lt. Berry meet the other requirements for an IIED claim.

### ii.       Failure to Pay for Flight

When viewed in the light most favorable to Lt. Berry, WorldWide refused to pay for Lt. Berry's flight back to the United States, stranding him in a foreign airbase, until the involvement of another WorldWide manager led to the release of funds for his ticket. *Pl.'s CSMF* ¶ 253. WorldWide maintains that such conduct "is not beyond all bounds of decency, atrocious, or utterly intolerable in a civilized community," and at best Lt. Berry was "inconvenienced." *Def.'s Mot.* at 13. The Subcontractor Agreement provides

> Travel at the end of the Project, including but not limited to expenses for return flight, shall not be paid unless and until Subcontractor returns all gear and identification documentation . . ., and unless and until Subcontractor submits to an audit verifying the return of all such materials. . . . Travel to the United States must be made within seven (7) days of the end of the Project or the termination of this Agreement by [WorldWide] whichever comes first. Should the Subcontractor fail to complete return travel within 7 (seven) days, the Subcontractor will be responsible for his or her own transportation from the Placement Area. In addition, if the Subcontractor terminates the Agreement before the Project is completed, Subcontractor shall be responsible for his or her own transportation from the Placement Area.

*Pl.'s SMF*, Attach. 11 at 3. According to the Subcontractor Agreement, there are some circumstances in which the subcontractor will be required to pay for his flight home. Whether

one such occasion arose in this case is unclear, as the facts surrounding Lt. Berry's trip home are undeveloped.  Regardless, any refusal to pay for Lt. Berry's flight was retracted and within a matter of hours, issues surrounding Lt. Berry's ticket were resolved.

"The standard for successfully pursuing a claim of intentional infliction of emotional distress is high."  *Leavitt v. Wal-Mart Stores, Inc.*, 238 F. Supp. 2d 313, 316-17 (D. Me. 2003), *vacated in part on other grounds*, 74 Fed. Appx. 66 (1st Cir. 2003).  Specifically:

> Liability [under this element] does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Restatement (Second) of Torts § 46 cmt. d; *see also Vicnire*, 401 A.2d at 154 (Me. 1979) (adopting section 46 of Restatement (Second) of Torts).  At most, WorldWide's temporary refusal to pay for Lt. Berry's flight back to the United States was an inconvenience, not conduct that exceeds all bounds of decency.

### iii.      Threats

Lt. Berry contends that Mr. Contreras made threats against Lt. Berry's military career, his family, and his physical safety.  *Pl.'s CSMF* ¶ 248.  Lt. Berry has not elaborated on these threats beyond stating that Mr. Contreras stated that "your career can be effected in the military if you don't do what I want" and "mentioned that there could be a problem with physical threats, threats to my – problems with my family."  *Id.*, Attach. 2, *Berry Depo*. 250:22-23; 250-51:25-1. There is no evidence that such threats were capable of being carried out or that Mr. Contreras or WorldWide intended to carry out such threats.  Made by one person only, the threats were

general in nature and lacked specifics.  Further, according to the Restatement of Torts, "liability

[in an IIED case] does not extent to threats."  Restatement (Second) of Torts § 46 cmt. d.

### iv.        Defamatory Statements

Lt. Berry alleges that WorldWide slandered Lt. Berry by incorrectly stating to

representatives of the United States Department of Defense that Lt. Berry refused to accept his

contract extension.  *Pl.'s CSMF* ¶ 255.  WorldWide cannot be liable for Lt. Berry's claims of

IIED to the extent that these claims are based on the alleged defamatory comments which are the

subject of his defamation claim.  As the Maine Supreme Judicial Court explained:

> Lola Rippett challenges the summary judgment entered in favor of Defendant
> McAlevey on her Count II claim against him for intentional infliction of
> emotional distress and on her Count III claim against him for negligent infliction
> of emotional distress.  Both counts are based on McAlevey's publication of false
> and defamatory statements concerning Rippett. As we have previously stated,
> these statements constitute slander per se as a matter of law.  If the statements
> alleged to be defamatory are privileged, there can be no recovery for the
> emotional distress allegedly sustained by Rippett for such recovery would
> undermine the privilege. *See Hutchinson v. Proxmire*, 579 F.2d 1027, 1036 (7th
> Cir. 1978), *rev'd on other grounds*, 443 U.S. 111 (1979). If the statements alleged
> to be defamatory are not privileged, any damages sustained by Rippett are
> subsumed by award for defamation. If defamation is proved, compensatory
> damages may include the elements of mental suffering, humiliation,
> embarrassment, effect on reputation and loss of social standing so far as they have
> been proved and may reasonably be presumed. *Saunders v. VanPelt*, 497 A.2d
> 1121, 1126 (Me. 1985). The court did not err in entering a summary judgment in
> favor of Detective McAlevey on Rippett's Count II claim for intentional infliction
> of emotional distress and her Count III claim for negligent infliction of emotional
> distress.

*Rippett v. Bemis*, 672 A.2d 82, 87-88 (Me. 1996); *Curtis*, 2001 ME ¶ 19, 784 A.2d at 26

(addressing negligent infliction of emotional distress); *Veilleux*, 206 F.3d at 129; *Cyr v. South*

*Portland Post No. 832*, Civil Action Docket No. CV-96-1258, 1998 Me. Super. LEXIS 293, at

*21 (Me. Super. Ct., Dec. 3, 1998).  Any damages, including emotional distress, suffered by Lt.

Berry as a result of the alleged defamatory statements will be included in a defamation award.

*Cyr*, 1998 Me. Super. LEXIS 293, at \*21 (citing *Rippett*, 672 A.2d at 87-88).  Lt. Berry's claims of IIED must be based on conduct other than the alleged acts of defamation.  *Cyr*, 1998 Me. Super. LEXIS 293, at \*21.

**v.      Firearm Possession**

Lt. Berry's Complaint alleges that WorldWide "den[ied] Lt. Berry access to a defensive weapon despite his service and placement in a hostile area, resulting in actions by military authorities to provide a defensive weapon to Lt. Berry while he performed services in their areas of operation."  *Compl*. ¶ 27.  In response to WorldWide's statement of material facts, Lt. Berry admits that he did not request a weapon when he was in Afghanistan, that he had permission to carry a weapon, but that they were waiting for the authorized weapons to be purchased and delivered, that he was given permission to access the weapons in the armory at RC South in Afghanistan, that he only asked for a personal side arm because he preferred his personal weapon over the one available in the Army, and that he was not unreasonably denied access to a firearm while in Afghanistan.  *Def.'s SMF* ¶¶ 68, 69, 71, 72, 75; *Pl.'s CSMF* ¶¶ 68, 69, 71, 72, 75.  In his response, Lt Berry failed to address WorldWide's contention that a denial of a firearm does not rise to the level of extreme and outrageous conduct or that he now admits that he was not denied access to a firearm while in Afghanistan.  *Def.'s Mot*. at 14; *Pl.'s Opp'n* at 8-10.  As Lt. Berry expressly admitted that he was not unreasonably denied access to a firearm while he was in Afghanistan, *Def.'s SMF* ¶ 71; *Pl.'s CSMF* ¶ 71, a cause of action premised on a denial of access to a firearm is without factual support and cannot stand.  Further, by failing to respond to WorldWide's motion on this point, Lt. Berry has waived the right to object.

### vi.    Conclusion

Taken either separately or together, WorldWide's termination of Lt. Berry, its temporary refusal to pay for his flight home, and the alleged threats do not rise to the level of conduct "so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community." *Curtis*, 2001 ME 158, ¶ 10, 784 A.2d at 22. Because there is no genuine issue of fact about WorldWide's conduct, Lt. Berry has failed to demonstrate all the elements of his IIED claim.[18] WorldWide is entitled to summary judgment with respect to Lt. Berry's IIED claim.

### E.    Malice

As explained by the Plaintiff, Lt. Berry's malice count is a claim for punitive damages, rather than a separate cause of action. *Pl.'s Opp'n* at 2 n.1. Lt. Berry may be entitled to punitive damages, should he be able to prove that WorldWide made slanderous and defamatory statements, and acted with malice when making those statements. *See Tuttle v. Raymond*, 494 A.2d 1353, 1363-64 (stating "[t]ortious conduct will justify an exemplary award only when the plaintiff can prove by clear and convincing evidence that the defendant acted with either express or implied malice"). Whether WorldWide acted with malice has yet to be developed, and the Court, therefore, denies WorldWide's motion for summary judgment on Count VI of Plaintiff's Complaint.

---

[18] Even if WorldWide's conduct rose to the level of extreme and outrageous conduct, Lt. Berry has failed to satisfy the remaining elements of his IIED claim, namely that WorldWide intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from its conduct; that WorldWide caused his emotional distress; and that the emotional distress suffered by Lt. Berry was so severe that no reasonable person could be expected to endure it.

## III.    CONCLUSION

The Court GRANTS in part and DENIES in part WorldWide Language Resources, Inc.'s Motion for Summary Judgment (Docket # 40).  The Court GRANTS summary judgment in favor of WorldWide Language Resources, Inc.'s Motion for Summary Judgment on Count IV of John Berry's Complaint; otherwise, the Court DENIES Defendant's Motion for Summary Judgment (Docket # 40).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 7th day of June, 2010